NOTICE
Decision filed 07/13/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260136

NOS. 5-26-0136, 5-26-0137 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* MAYBELL E. and SHIRLEY E., Minors | ) ) | Appeal from the Circuit Court of |
| (The People of the State of Illinois, | ) ) | Moultrie County. |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | Nos. 20-JA-2, 20-JA-3 |
| John E., | ) ) | Honorable Jeremy J. Richey, |
| Respondent-Appellant). | ) ) | Judge, presiding. |

JUSTICE BOLLINGER delivered the judgment of the court, with opinion.
Presiding Justice Cates and Justice Boie concurred in the judgment and opinion.

**OPINION**

¶ 1 This consolidated appeal involves the parental rights of the respondent, John E. (Father), as to his two minor daughters, Maybell E. and Shirley E., who were born, respectively, in December 2014 and January 2014. Father contends the circuit court of Moultrie County erred when the court (1) found Father unfit following a December 9, 2025, fitness hearing and (2) terminated his parental rights following a February 6, 2026, best interests hearing. For the reasons that follow, we reverse.

¶ 2                                  I. BACKGROUND

¶ 3 On September 10, 2020, the State filed, in circuit court case Nos. 20-JA-2 and 20-JA-3, petitions for adjudication of wardship, in which the State alleged that on September 9, 2020, the

1

minors were taken into protective custody and that they were otherwise homeless. Because the cases for the most part mirror one another, we will refer to them collectively when possible. The mother of the minors (Mother) was involved in many of the circuit court proceedings, but was not involved in a relationship with Father at any point in the proceedings, and is not a party to this appeal. We refer to her only when necessary to an understanding of Father's appeal.

¶ 4    In its petitions for adjudication of wardship, the State alleged that the minors were neglected, in that their environment was injurious to their welfare. In paragraph 3A of the petitions, the State alleged that on or about September 8, 2020, Father left the minors "with a person unable to care for" them and that, as of the following morning, Father had failed to return to get the minors after having said he would. In paragraph 3B, the State alleged that Father was homeless and that on or about July 30, 2020, and on or about September 4, 2020, Father and the minors were living in Father's car. In paragraph 3C, the State alleged that on May 30, 2020, "Father possessed a substance containing methamphetamine as alleged in Shelby County cause 20-CF-54." In paragraph 3D, the State alleged that the minors "observed acts of violence between" Father and another individual "while inside *** Father's vehicle." The State alleged that it was in the best interests of the minors that they be adjudged wards of the court. Shelter care reports dated September 10, 2020, were attached to the petitions.

¶ 5    Also on September 10, 2020, the circuit court held a shelter care hearing,[1] after which the court entered orders in which it found probable cause to conclude that the minors were neglected, and granted temporary guardianship of the minors to the Illinois Department of Children and Family Services (DCFS) with the power to place the minors in appropriate settings. A record sheet

---

[1]The only hearings that were transcribed and included in the record on appeal in these cases were the December 9, 2025, fitness hearing, and the February 6, 2026, best interests hearing.

entry shows that, at the shelter care hearing, counsel was appointed to represent Father. Subsequent record sheet entries show that Father was present at three of the next seven hearings in the cases but was not present at four of them. His failure to appear at one of those hearings—an adjudicatory hearing scheduled on February 11, 2021—led to the State requesting a default judgment against Father. The circuit court denied the State's request, citing "insufficient notice," but ordered that Father be given notice that his failure to appear at the rescheduled adjudicatory hearing could result in a default judgment against him. He was told the same in person at a hearing he attended on March 22, 2021.

¶ 6    On March 30, 2021, the rescheduled adjudicatory hearing was held, which Father attended. A record sheet entry from that date indicates that Father admitted the allegations in "paragraphs 3A, 3B and 3C after explanation of same," as well as after explanation of Father's "rights and the possible dispositions." The circuit court stated that the admissions were made "freely and voluntarily," and were accepted by the court. A dispositional hearing was set for June 8, 2021. A written adjudicatory order, dated March 30, 2021, was entered that found the minors to be neglected, on the basis that Father "stipulated that the facts supporting the allegations in [paragraphs 3A, 3B, and 3C] are true." The order stated that the circuit court's finding was supported by "[a] preponderance of the evidence."

¶ 7    Father appeared at the June 8, 2021, dispositional hearing, which was continued by agreement of the parties to July 12, 2021. He also appeared at the July 12, 2021, hearing, which too was continued, this time until August 20, 2021, and at the August 20, 2021, hearing, which was continued until September 7, 2021. However, he failed to appear at the actual dispositional hearing, which was held on September 7, 2021. Following that hearing, the minors were made wards of the court, with guardianship placed with DCFS. A permanency review was set for

3

December 7, 2021, with a goal of return home in 12 months. A written dispositional order was entered on September 8, 2021, in which the circuit court specifically noted that Father "failed to appear" at the September 7, 2021, hearing. Subsequent record sheet entries show that Father was present for the next nine hearings in the case, which spanned the time period of December 7, 2021, to February 15, 2023.

¶ 8     On April 18, 2023, the State filed a motion seeking findings of unfitness and the termination of the parental rights of both Father and Mother. Therein, the State alleged that Father was unfit on the following grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the minors (750 ILCS 50/1(D)(b) (West 2020)); (2) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minors during any nine-month period following adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2020)); and (3) failure to make reasonable progress toward the return of the minors during any nine-month period following adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)). At a hearing on April 18, 2023, which Father attended, the case was "continued for further permanency review [on] May 15, 2023."

¶ 9     Father attended each of the next five hearings in the case, spanning the time period of May 15, 2023, to January 16, 2024. On January 16, 2024, the foster parents who had cared for the minors since September 9, 2020, filed petitions to intervene in the case, alleging that it was in the best interests of the minors for the foster parents to be allowed to intervene and participate in the case. Father failed to appear at hearings on February 8, 2024 (at which the petition to intervene was granted), and on April 5, 2024, but did attend a hearing on April 25, 2024. Father failed to appear at the next hearing, on August 27, 2024, and was ordered, in his absence, "to get a phone

4

within 14 days and confirm all future visits through text." The circuit court further stated that future "[v]isits must be confirmed by [Father,] not counsel on his behalf."

¶ 10 Father failed to appear at the next six hearings in the case, which spanned the time period of October 18, 2024, to September 2, 2025. A record sheet entry from the September 2, 2025, permanency review hearing shows that Father's counsel attempted to have his appointment to represent Father vacated at that hearing, but that his request was denied, although the entry does not include any reason for the request or the denial. The entry also shows that the circuit court ordered DCFS "to perform a diligent search inquiry as to [Father]." The circuit court continued the matter until December 9, 2025, "for permanency review and hearing on the Motion for Default as to Respondent Father." The entry does not state which party filed the motion for default, and there is no written motion for default in the record.

¶ 11 Three days later, on September 5, 2025, the State filed a second motion for finding of unfitness and termination of parental rights. Unlike the first motion, which sought findings related to both Father and Mother, the second motion was directly solely to Father. The motion did not mention default. The motion alleged that Father was unfit on the following grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the minors (750 ILCS 50/1(D)(b) (West 2024)); (2) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minors during any nine-month period following adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2024)), "specifically: March 7, 2023—December 7, 2023 and December 7, 2023—September 7, 2024 and September 7, 2024—June 7, 2025"; (3) failure to make reasonable progress toward the return of the minors during any nine-month period following adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2024)), "specifically: March 7, 2023—December 7, 2023 and December 7, 2023—September 7, 2024 and

September 7, 2024—June 7, 2025"; (4) desertion of the minors (750 ILCS 50/1(D)(c) (West 2024)); (5) failure to protect the minors from conditions in his environment that were injurious to their welfare (750 ILCS 50/1(D)(g) (West 2024)); (6) addiction to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceeding (750 ILCS 50/1(D)(k) (West 2024)); and (7) intent to forgo his parental rights, as shown by his failure for a period of 12 months to communicate with the minors or the agency, although able to do so, and not prevented from doing so by the agency or a court order, or failure to maintain contact with or plan for the future of the minors, although physically able to do so (750 ILCS 50/1(D)(n) (West 2024)).

¶ 12 On November 4, 2025, the State filed an affidavit for service by publication, in which it averred that Father could not be found and that his present address could not be determined, even after "diligent inquiry." The State also filed documents from DCFS certifying that it had completed a "comprehensive diligent search" for Father on September 22, 2025. On November 5, 2025, the circuit court entered an order allowing service on Father, by publication, for the fitness hearing scheduled for December 9, 2025. Additional documents in the common law record reveal that the service by publication involved publishing a notice to Father of the December 9, 2025, fitness hearing in a newspaper called the New Progress, located in Moultrie County, on November 12, 2025, and placing that notice "on a statewide public notice website as required by 715 ILCS 5/2.1." The notice was also mailed by the circuit clerk to Father at two separate addresses in Decatur.

¶ 13 The fitness hearing was held on December 9, 2025. The record sheet entry for that date states, "Cause called for hearing on the Motion for Default as to Respondent Father." Again, no mention is made of which party filed the motion for default. At the outset of the hearing, the circuit court noted that although Father's counsel was present, Father was not. The State asked the circuit

6

court to review the record and to approve the service by publication that was conducted with regard to Father, so that the State "could proceed with a termination of parental rights as to him today." The circuit court asked Father's counsel what his position was on "default." Father's counsel stated that he would object to a finding of default. The circuit court stated that it would show that, over Father's counsel's objection, "Father is defaulted and terminated."

¶ 14 Father's counsel asked if "a prove-up" was necessary, to which the State answered, "I think I would like to briefly put on evidence to prove up the default." The circuit court stated, "That will be granted." The State then stated that it would "ask the [circuit court] to take judicial notice of the prior record of proceedings and the orders entered in 20-JA-2 and 20-JA-3, including but not limited to the more recent docket entries, indicating [Father] has failed to appear for court hearings in this matter for some months." The circuit court thereafter stated, "I didn't say it, but I'll take judicial notice of prior proceedings in this case."

¶ 15 As its sole witness, the State called Janessa Watson, who testified that she was a foster care case manager with One Hope United. She testified that she became responsible for managing this case in January 2025 and that, as part of that process, she reviewed "the prior reports, prior goals, [and] prior client service plans." The State then asked Watson if, as part of "the actual work" Watson had done on the case, "not relying on anyone else's work," Watson had any contact with Father. Watson testified that she had had "two phone conversations with" Father since January of 2025, with the last phone conversation being "in August of 2025." She clarified that Father initiated both calls and that both calls were about "[v]isitation."

¶ 16 Watson testified that Father was allowed visitation under the agency's policies and the court's orders and that each call resulted in a visit between Father and the minors. She testified that Father "had two visits since August of 2025." She testified that she did not know where Father

7

presently lived and that his last known address, pursuant to "a diligent search shortly after the last court hearing," was in Decatur, "perhaps at the Salvation Army Men's Center." Watson was then asked, "What about any services that were—that were ordered for him? Has he participated in anything such as verifying employment?" Watson testified, "I have not received anything since 2024." She testified that she did not know if Father was "in fact working or not" and was "not sure" if Father was living with anyone in Decatur. She testified that a woman named Shayla, whom she believed was a friend of Father's, attempted to confirm visitation for Father, but that Watson's agency decided that was not appropriate because "the biological parents who the visit is with" were required to confirm.

¶ 17     When asked if to her knowledge, Father "currently [had] a warrant outstanding for him in a criminal case in Macon County," Watson testified, "I believe so, yes." When asked if Father "had engaged in any kind of outpatient substance abuse treatment," she testified, "Not to my knowledge." She testified that Father had not kept the same phone number during the time Watson was involved with the case and that she had "five different phone numbers [for Father] at the moment." When asked if, in addition to scheduling visitation, she had attempted to update Father "with regard to anything in connection with [this] case," Watson testified, "Yes. I sent a letter out with the diligent search, stating who I was, how to contact me, and what I would like to contact him about." She testified that she did not receive a response from Father to her letter.

¶ 18     Father's counsel declined to cross-examine Watson. On cross-examination by counsel for DCFS, Watson clarified that the letter was sent out after she completed a diligent search on September 22, 2025, and she reiterated that she received no response to the letter. The circuit court did not question Watson, and the State thereafter announced that it did not wish to present additional evidence "[a]s to default." In argument, the State contended that it was "clear that while

8

*** Father was engaged in the case and engaged in services earlier on, this is a very old case, and it's been a long time since he's done anything besides set up two visits, and as far as the length of time these children have been in custody and what their needs are, that's simply not cutting it," for which reason the State asked the circuit court to find Father unfit. Counsel for DCFS argued that "the State has met their burden of proof in [this] case." Father's counsel argued that Father had "made his two visits in August," and although that was "not what one would hope for," counsel believed "it show[ed] some effort, and therefore a minimal effort on his part should defeat the motion for default."

¶ 19 The circuit court stated that "[t]he State [had] met its burden," and ordered the State to prepare a written order that showed "termination by default, and there's been a proper prove-up in this case." A best interests hearing was scheduled for January 12, 2026. The circuit court directed the circuit clerk to provide "notice to [Father] at his last known address."

¶ 20 On December 10, 2025, the circuit court filed a written order in which it found that Father "failed to appear and [was] in [default]." The order further stated that the circuit court had examined and approved "the notice by publication concerning" Father. The order stated that the circuit court had heard evidence, and found by clear and convincing evidence that Father was unfit on the following grounds alleged in the petition: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minors; (2) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minors, during any of the nine-month periods alleged in the petition, "specifically: March 7, 2023—December 7, 2023 and December 7, 2023—September 7, 2024 and September 7, 2024—June 7, 2025"; (3) failure to make reasonable progress toward the return of the minors to him, during any of the nine-month periods alleged in the petition, "specifically: March 7, 2023—December 7, 2023 and December 7,

9

2023—September 7, 2024 and September 7, 2024—June 7, 2025"; (4) desertion of the minors; and (5) failure to protect the minors from conditions in his environment that were injurious to the minors.

¶ 21    Father appeared at the January 12, 2026, hearing, which was his first appearance at a hearing in the case since April 25, 2024. The January 12, 2026, hearing was continued to February 6, 2026, for reasons that are not stated in the record sheet entry. There is no indication in the record sheet entry that Father's counsel asked the circuit court to vacate its finding of unfitness and reopen the proofs, or to otherwise reconsider its finding of unfitness or set it aside, in light of the fact that Father was present.

¶ 22    On February 6, 2026, the best interests hearing was held, with Father in attendance. Again, there is no indication—in the record sheet entry or in the report of proceedings—that Father's counsel asked the circuit court to vacate its finding of unfitness and reopen the proofs, or to otherwise reconsider or set aside its finding of unfitness, in light of the fact that Father was present. At the outset of the hearing, the circuit court asked the State to "go ahead and do appearances," after which the State indicated that it believed "we basically have a two-part matter for the Court to address today." The State indicated that as to Father, the hearing was set for "a phase-two termination of parental rights best interests hearing," and as to Mother, for a permanency review hearing. After discussing matters not relevant to Father's case, the circuit court stated that it would proceed with the best interests hearing.

¶ 23    The State called Father as its first witness. Father testified that he lived in Decatur, where he "rent[ed] a basement, a room out month to month." He testified that he had lived there for "[a]bout a year" and was able to pay his rent by working for himself and "for another guy." He

testified that he was "trying to start" his own company, doing cleaning and painting. He testified that he had worked for someone else for the last four years.

¶ 24 Father agreed that he was the father of the minors and that, although he "used to attend court each and every time" a hearing was held in this case, he "stopped for over a year until [he] showed up a couple of weeks ago." When asked why he stopped attending court hearings, he responded, "Honestly, I'm in Decatur. I have no access. People keep stealing my phone. Every time I get one, they steal my phone, and honestly, I forget about it. I work every day. I just—it don't cross my mind about *** coming to court. You know, I'm still trying to make that dollar until I come up with my business." Father testified that he believed the minors would be better off living with their mother than being taken from both parents, because he did not "want any kid to go to the State, any kid at all."

¶ 25 Father testified that he appeared in court because he wanted to continue to have a relationship with the minors and that he wanted to visit them "[e]very day." When asked if it was true that he had not completed substance abuse treatment and was not currently participating in it, Father testified, "I was at the court the other day. I stopped going. The last couple weeks have been really, really hard on me. I don't know how to answer this. My world has disappeared. It's vanished in front of me again." With regard to his present living arrangement, Father conceded that the minors did not currently have a separate bedroom for themselves, but that "[t]hey could have." When asked if there was a reason he had not already "arranged that," Father testified, "No, because I ain't had permission from you yet."

¶ 26 When asked if it was true that he had not completed mental health treatment and was not currently participating in it, Father disputed that he was required to attend mental health treatment, claiming that his caseworker told him he did not need mental health treatment and that there was

11

no order in his case file requiring it. When asked if he had "issues confirming visits" with the minors and had not seen them since October 2025, Father testified, "I've called every Wednesday and been waiting at the library with dinner, everything I bring." He testified that he was "trying to get the phone records from everybody [he] called to use their phone to confirm," but that was difficult because he was "on foot and [had] to go here to here to locate these numbers." He added, "I have proof, documentation, phone records that state I've called and confirmed my visit every day. Ever since before October, I've been at the library. I'm still going to the library every Thursday at 3:45, knowing they ain't going to be there, but I show up." When asked if he called "in advance to confirm the visits," Father testified, "On Wednesdays, that's when I'm supposed to between 8 and 5." He testified that despite his phones being stolen, he called to confirm on "[a]nybody's phone I can."

¶ 27    When asked, Father was able to tell which grade each minor was in but admitted that he did not know the names of either minor's teachers. He added that he did not contact their school because he did not "want to get in trouble." He testified that the minors' foster mother was "one of the best things that happened to" the minors, because the minors loved her and "talk[ed] about her all the time." He agreed that the minors had told him that they liked living with their foster mother. Father testified that he was on probation for a possession of methamphetamine case from Macon County and that he was in compliance with his probation conditions.

¶ 28    On cross-examination by the guardian *ad litem* (GAL), Father agreed that his last visit with the minors was in October 2025, "[b]efore Halloween," although he did not know the exact date of the visit. He testified that the visit lasted two hours and that he played with the minors. He testified that he attempted to help them with their homework, but that the minors told him that he wasn't "smart enough to help them with" it, so he let "their driver" assist them. He testified that

prior to the last visit, he visited them "[e]very other week like [he was] supposed to," although he conceded that he "missed a couple" of visits because he got his "days confused" and his "holidays mixed up." He testified that he did not "miss too many visits."

¶ 29    When asked if he called to confirm visits, Father again stated that he "called every Wednesday to confirm [his] visit," but that he kept "getting the secretary," who told him she would convey his message to his caseworker. He testified that he had attempted to call his caseworker directly but had not been able to reach him.

¶ 30    With regard to his basement room, Father testified that he had put up "panels" to create "a privacy barrier" and that he hoped to have his "own place hopefully real soon in the next couple months when the next one comes up available." He testified that he had not been able to move out of the basement room yet because he could not afford to move anywhere else. He testified that the basement room had access to a kitchen upstairs and a bathroom that also was upstairs.

¶ 31    When asked if he stopped attending court dates in this case because he "got confused" and "got too busy with" his job, Father testified, "I can't—I don't remember. I don't remember dates. With the cards, I lose them all the time. I leave them in my pocket and wash them or they get ruined. I lay it down and turn around and come back and misplace it." He added that when he was attending hearings, he lived close enough to walk to the courthouse, but that he now lived "50 miles away" and could not walk that far.

¶ 32    On cross-examination by his counsel, Father testified that he completed a parenting class and was "currently receiving substance abuse treatment through Heritage." He testified that he was "about halfway through" the treatment and reiterated that he was told he did not need mental health services. He again testified that, although he had not attended visitation with the minors since October 2025, he had attempted to confirm visits regularly since then. He testified that if the minors

13

came to his basement room, they could sleep in his bed and he could sleep in a chair that he "usually" slept in anyway. He testified that he still wanted to see the minors and still wanted to be a part of their lives.

¶ 33   On examination by the circuit court, Father testified that the building in which he lived was "a three-story" house, consisting of "a top floor, middle floor, and basement." He testified that he shared the basement with "a couple." He testified that he did not know anything about the criminal history or background of the other residents of the house. He further testified that the basement did not have drywall and had concrete floors because it was "just a concrete foundation." He testified that there was no "partition" in the basement but that he "made a wall for" himself by using "like a cubicle you put together." He testified that he had his own door to his part of the basement and that the couple had their own door to their part.

¶ 34   The next witness to testify was Watson. She again testified that she was a foster care case manager with One Hope United. Watson testified that she had not received information from Father about the details of his current housing arrangement and that, to her knowledge, no one from her agency had inspected Father's home because they did not previously know where Father lived. She testified that she had documentation that Father completed a parenting class and that she "believe[d]" there was a mental health referral in this case but that Father "did not complete it." She added, "I know he was enrolled for a little bit, but he did not complete the services." She testified that she did not have any documentation that Father had "engaged in substance abuse treatment through his probation sentence in the Macon County case."

¶ 35   Watson testified that Father had not visited with the minors since October 2025 and that Father confirming visits had been "an issue." With regard to Father's testimony that he had tried to confirm visits, Watson testified that she had "three messages from [One Hope United's]

14

Charleston office, stating that [Father] was trying to contact" her, but that although she called the phone numbers on file for Father, she was not "able to contact him back." She testified that she provided Father with her "work number at our last hearing" and told Father he could contact her to set up visits, but "had not received anything from him."

¶ 36    Watson testified that the minors had been with their foster mother since 2020. She testified that there were no concerns about the "stability" of that placement and that the minors attended school, were "doing fine" there, and had friends they were comfortable with there. She testified that the minors got along with their foster mother's children, that the foster family showed affection for the minors, and that the family "authorized and supported the [minors] in forming ties through school and friends." She agreed that the foster family had "committed absolutely to maintaining these girls in their home" and that the minors had proper food, clothing, and shelter and their needs were being met.

¶ 37    On cross-examination, Watson testified that she had last visited the foster home on January 30, 2026. She testified that the minors shared a bedroom with each other in the home. She testified that her impression was that the minors had "a good very, close, relationship with the foster" family and that she saw it as a loving relationship. She testified that the foster family accepted the minors as part of the family and that the minors had told Watson that they wanted to continue to live with the foster family. She testified that the minors sometimes talked about Father and did not complain about their visits with him at the library, except that one child said the visits were "boring." She testified that Father's last visit with the minors was October 16, 2025, and that prior to that, the visits occurred "[m]aybe once a month" in 2025. She testified that she believed the visits "were more consistent before 2025."

¶ 38    In argument, the State contended that Father "had essentially five years to get it together," during which time the minors were "placed outside of a home of a parent." The State argued that during that "five years for the kids in foster care," Father was required to "establish a residence, establish a job, basically be in a position to provide stability." The State added, "He hasn't done it." The State argued that it was not in the best interests of the minors "to be attached to a parent and have responsibilities toward that parent when the parent cannot reciprocate and take care of the children under the legal standards." The State argued that the current foster placement was in the best interests of the minors, stating: "They're stable there. They're loved there. They have community ties there. All the things that are required for their health and safety are being provided by that family, *** and I don't know how people could demonstrate their commitment to children any more than to have them in their home for five years. This has been the only foster placement that [the minors] have had."

¶ 39    The GAL argued that Father's rights should be terminated, noting that the case started with the minors "living in a car with" Father and that "five, six years down the road *** his housing situation is improved marginally, but there's also been a lot of fall downs." He argued that Father was unable to confirm visits with the minors and had accrued "three felony drug charges" over the last several years, which led the GAL to question whether the minors needed "to be in a situation where that situation arises with the frequency that it has." Father's counsel argued that Father was trying and had never abandoned the minors, even if he struggled to meet their needs. He argued that, under the best interests standard, Father's parental rights should not be terminated. Counsel for DCFS argued that despite Father's love for the minors, Father had "not done what he needs to do to show that this case is moving forward with him." She argued that the minors had spent five

16

years in foster care and that the State had met its burden with regard to the statutory best interest factors.

¶ 40　The circuit court stated that it had considered all of the requisite statutory factors and would specifically reference some of the factors. With regard to the physical safety and welfare of the minors, the circuit court found that Father's basement room was "completely inappropriate and inadequate for two minor children to be living in" and that Father's substance abuse issues and mental health issues prevented Father from providing "a safe physical environment for these children." Thereafter, the circuit court stated that "when you look at the foster care situation, that is a safe location where the children['s] needs are being met," and that the minors had "lived at that foster care residence for five years and [did] have strong ties to that residence." The circuit court added that because of the minors' "ties to that foster family and that location, it would be in their best interests to continue there for the time being." The court stated that the minors desired "to reside at the foster care family location, and" were "getting stability at that location."

¶ 41　The circuit court also found that Father's "situation" was "inadequate with him *** not following through on visitation like he should" and opined that Father needed "to keep a phone" and needed to keep DCFS and other agencies "informed of that phone so they can get in touch with him." The court stated that Father was "just not making the concrete steps and actions to" be able to care for the minors. The court concluded that the State had met its burden of proving by a preponderance of the evidence that it was in the best interests of the minors for Father's parental rights to be terminated.

¶ 42　On February 9, 2026, the circuit court entered a written order finding that it was in the best interests of the minors for the court to terminate Father's parental rights, and ordering that his parental rights were therefore terminated. This timely appeal followed.

17

¶ 43                                  II. ANALYSIS

¶ 44    Parents have a fundamental liberty interest in the care, custody, and management of their children. *In re D.T.*, 212 Ill. 2d 347, 363 (2004). Because of this fundamental liberty interest, "a proceeding to involuntarily terminate a parent's rights is a 'drastic measure.' " *In re E.B.*, 231 Ill. 2d 459, 463 (2008) (quoting *In re D.C.*, 209 Ill. 2d 287, 295 (2004)). The authority to involuntarily terminate parental rights is purely statutory, and the scope of the circuit court's authority is defined by those statutes. *In re E.B.*, 231 Ill. 2d at 463. The involuntary termination of parental rights under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) is a two-step process. *In re M.I.*, 2016 IL 120232, ¶ 20. The State must first prove by clear and convincing evidence that the parent is unfit under any of the discrete and independent grounds listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re M.I.*, 2016 IL 120232, ¶ 20; *In re C.W.*, 199 Ill. 2d 198, 217 (2002) ("[T]he grounds set forth in section 1(D) each provide a discrete basis for a finding of unfitness."). Clear and convincing evidence is "that quantum of proof that leaves no reasonable doubt in the mind of the fact finder about the truth of the proposition in question." *In re John R.*, 339 Ill. App. 3d 778, 781 (2003). We note that "[a]lthough stated in terms of reasonable doubt, courts consider clear and convincing evidence to be more than a preponderance, while not quite approaching the degree of proof necessary to convict a person of a criminal offense." *In re John R.*, 339 Ill. App. 3d at 781.

¶ 45    Although the State may rely on several grounds in its motion to terminate parental rights, a finding adverse to the parent on any single ground is sufficient to support a subsequent termination of parental rights. *In re C.W.*, 199 Ill. 2d at 217. In other words, "only one ground of [parental] unfitness need be proved to find a parent unfit." *In re J.P.*, 261 Ill. App. 3d 165, 174 (1994).

¶ 46    If the court finds that a parent is unfit, the matter proceeds to a second hearing, at which the State must prove by a preponderance of the evidence that it is in the best interests of the minor children to terminate parental rights. *In re D.T.*, 212 Ill. 2d at 352, 366. At this stage of the proceedings, the circuit court's focus necessarily shifts to the best interests of the children and away from the rights of the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 30. "[T]he parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life" (*In re D.T.*, 212 Ill. 2d at 364), because a prompt, just, and final resolution of a child's status, as opposed to having that status remain in limbo, is in the child's interests. *In re D.L.*, 191 Ill. 2d 1, 13 (2000).

¶ 47    On appeal, this court accords great deference to the circuit court's decisions in termination proceedings because the circuit court is in a better position to observe witnesses and to judge their demeanor and credibility. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. This court does not reweigh the evidence or reassess the credibility of witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Unless the circuit court's findings of parental unfitness or the child's best interest are against the manifest weight of the evidence, this court will not disturb the circuit court's findings. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 48    With regard to the fitness findings in this case, Father's counsel on appeal argues that (1) the evidence presented at the fitness hearing was far from sufficient to prove any of the alleged grounds of unfitness and (2) the circuit "court's failure to set forth a factual basis for its decision precludes meaningful review." Because we agree with Father's first argument—which is,

19

essentially, that the State did not prove, by clear and convincing evidence, any of the alleged grounds of unfitness at the prove-up hearing—we need not consider his second argument.

¶ 49    We first address the State's contention, in its brief on appeal, that "the State was not required to prove-up its fitness allegations" at the December 9, 2025, fitness hearing. In *In re C.J.*, 2013 IL App (5th) 120474, ¶ 7, after examining longstanding principles of civil practice, we clearly and unequivocally held that when, in a termination of parental rights case, "a party files an appearance and places in issue the allegations of the complaint or petition, the circuit court cannot enter a default judgment simply because the party failed to appear for the trial or hearing." We further held that, "[i]nstead, the petitioner must prove the allegations of the petition as if the respondent had been present to try the case." *In re C.J.*, 2013 IL App (5th) 120474, ¶ 7. In support of both of these holdings, we cited *Reuben H. Donnelley Corp. v. Earles*, 268 Ill. App. 3d 263, 265 (1994), which in turn cited an earlier civil case, part of an unbroken chain of such cases leading back to the October 1, 1912, decision in *Wacker v. Young*, 172 Ill. App. 255 (1912) in which this court ruled that a default judgment against a defendant that was entered after the defendant was "absent from the court room" on the date of his trial was in error because "after an appearance by defendant and pleas and affidavit of merits were filed," the plaintiff, to obtain a judgment, was required to "proceed and try his cause *** in the same manner as if the defendant had answered to his name when called." *Wacker*, 172 Ill. App. at 256-57.

¶ 50    We recognize that *In re C.J.* involved a slightly different procedural posture than this case, because in *In re C.J.*, the State "filed a motion for remand, arguing that the circuit court erred in entering a default judgment against [the respondent] because no evidence of unfitness was presented," a proposition with which we agreed. *In re C.J.*, 2013 IL App (5th) 120474, ¶ 1. However, we do not believe the procedural posture of *In re C.J.* dictates a different result in this

case, because the longstanding principles of civil practice stated above remain true whether the State concedes them or not. We believe this is particularly so where, as here, the " 'drastic measure' " (*In re E.B.*, 231 Ill. 2d at 463 (quoting *In re D.C.*, 209 Ill. 2d at 295)), of terminating a parent's fundamental liberty interest in the care, custody, and management of their children is at issue. See *In re D.T.*, 212 Ill. 2d at 363. Accordingly, we reiterate that *In re C.J.* remains good law and that the State is incorrect in its assertion that it was not required to prove-up the allegations against Father in this case. Father entered an appearance early on in this case and was appointed counsel. Father's counsel appeared at the hearing on December 9, 2025, and objected to Father being defaulted. Indeed, although Father did not personally appear at the fitness hearing, his counsel was present and contested the State's allegations arguing that Father had "made his two visits in August," and although that was "not what one would hope for," counsel believed "it show[ed] some effort, and therefore a minimal effort on his part should defeat the motion for default."

¶ 51 Having addressed the State's argument regarding the necessity of a prove-up hearing in this case, we turn next to the evidence that was presented at the prove-up hearing, and the question of whether that evidence was sufficient to prove, by clear and convincing evidence, any of the allegations of unfitness against Father contained in the September 5, 2025, second motion seeking finding of unfitness.

¶ 52 The testimony of Watson—the sole witness to testify at the December 9, 2025, prove-up hearing—is described in detail above. She testified that since she became responsible for managing the case in January 2025, her only contact with Father had been "two phone conversations"— initiated by Father and concerning visitation—with the last phone conversation being "in August of 2025." She further testified that "Father had two visits since August of 2025," and that she did

21

not know where Father presently lived. Watson was then asked, "What about any services that were—that were ordered for him? Has he participated in anything such as verifying employment?" She testified, "I have not received anything since 2024." She thereafter testified that (1) she did not know if Father was "in fact working or not"; (2) she believed Father presently had "a warrant outstanding for him in a criminal case in Macon County"; (3) she had no knowledge that Father "had engaged in any kind of outpatient substance abuse treatment"; (4) he had not kept the same phone number during the time Watson was involved with the case, resulting in her having "five different phone numbers [for Father] at the moment"; and (5) her attempt to locate Father as part of a diligent search included sending a letter to Father's last known address, to which she did not receive an answer.

¶ 53    The State relied upon this testimony to attempt to prove by clear and convincing evidence that Father was unfit on the following grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the minors (750 ILCS 50/1(D)(b) (West 2024)); (2) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minors during any nine-month period following adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2024)), "specifically: March 7, 2023—December 7, 2023 and December 7, 2023—September 7, 2024 and September 7, 2024—June 7, 2025"; (3) failure to make reasonable progress toward the return of the minors during any nine-month period following adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2024)), "specifically: March 7, 2023—December 7, 2023 and December 7, 2023—September 7, 2024 and September 7, 2024—June 7, 2025"; (4) desertion of the minors (750 ILCS 50/1(D)(c) (West 2024)); (5) failure to protect the minors from conditions in his environment that were injurious to their welfare (750 ILCS 50/1(D)(g) (West 2024)); (6) addiction to drugs, other than those prescribed by a physician, for at least one year immediately

22

prior to the commencement of the unfitness proceeding (750 ILCS 50/1(D)(k) (West 2024)); and (7) intent to forgo his parental rights, as shown by his failure for a period of 12 months to: communicate with the minors or the agency, although able to do so, and not prevented from doing so by the agency or a court order, or failure to maintain contact with or plan for the future of the minors, although physically able to do so (750 ILCS 50/1(D)(n) (West 2024)).With regard to the two allegations that required proof of reasonable efforts or reasonable progress during specific nine-month time periods, we again note that Watson testified that she became responsible for managing this case in January 2025. She did not provide an exact date. However, even if we were to assume, *arguendo*, that she took over the case at the beginning of January 2025, at most she was involved in the case for a little more than five months before the expiration of the final nine-month time period alleged in the motion, which was September 7, 2024, to June 7, 2025.

¶ 54    Moreover, although Watson testified that she reviewed "the prior reports, prior goals, [and] prior client service plans," she did not testify at all about the contents of Father's service plans, the conditions that were the basis for the removal of the minors from Father's care, or any efforts or progress made by Father with regard to complying with his service plans. She answered vague questions that appeared to be related to service plans, but not with the precision necessary to support any findings of unfitness by clear and convincing evidence. In addition, Watson provided no testimony—at all—that would support findings, by clear and convincing evidence, that Father (1) failed to protect the minors from any conditions in his environment that were injurious to their welfare; (2) was addicted to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceeding; or (3) intended to forgo his parental rights, as shown by his failure for a period of 12 months to communicate with the minors or the agency, although able to do so and not prevented from doing so by the agency or a court

order, or failure to maintain contact with or plan for the future of the minors, although physically able to do so.

¶ 55    As Father's appellate counsel points out, to prove the allegation that Father "deserted" the minors, the State was required to prove "conduct indicating an intention to permanently terminate custody over a child while not relinquishing all parental rights." *In re Dawn H.*, 281 Ill. App. 3d 746, 757 (1996). Watson did not provide any testimony that would support this allegation. If anything, her testimony that Father initiated contact with her to set up visits with the minors and did in fact have "two visits since August of 2025," refutes the allegation that Father had the intention to permanently terminate custody over the minors. Thus, her testimony, alone, does not support a finding by clear and convincing evidence of this allegation either. With regard to the remaining allegation—that Father was unfit due to his failure to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the minors—we first note that when determining whether a parent has maintained a reasonable degree of interest, concern, or responsibility for the welfare of the children, a reviewing court's "focus is on the parent's reasonable efforts more so than the parent's success." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36. Thus, the reviewing court must consider any circumstances that made it difficult for the parent to demonstrate the requisite reasonable degree of interest, concern, or responsibility. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36.

¶ 56    However, a parent cannot avoid a finding of unfitness by showing some interest, concern, or responsibility; the question is whether the parent's interest, concern, or responsibility is reasonable. *In re M.I.*, 2016 IL 120232, ¶ 30. Likewise, "a parent need not be at fault to be unfit." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). In addition, because the statutory language is disjunctive, any one of the three elements may provide a basis for a finding of unfitness. *In re*

24

*Za. G.*, 2023 IL App (5th) 220793, ¶ 36. That is, a parent may be found unfit for failing to maintain a reasonable degree of interest, a reasonable degree of concern, or a reasonable degree of responsibility. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36. Evidence of infrequent or inconsistent visitation with the child or children is sufficient to support a finding of unfitness on this ground. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33 (citing *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24). Evidence of noncompliance with an imposed service plan likewise is sufficient to support a finding of unfitness on this ground. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33 (citing *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24). Unlike failure to make reasonable progress toward the return of the children, failure to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare is not limited to a specific time period. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 33; see 750 ILCS 50/1(D)(b) (West 2024).

¶ 57     We do not believe that, by itself, Watson's testimony about Father's alleged infrequent or inconsistent visitation with the minors—"two visits since August of 2025"—supports a finding, by clear and convincing evidence, that Father failed to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the minors. Watson did not testify as to how much visitation Father was allowed, which makes it impossible to determine whether "two visits since August of 2025" can reasonably be deemed infrequent or inconsistent. Likewise, her vague testimony that appears to have been related to Father's service plans was not specific enough, by itself, to prove by clear and convincing evidence that Father was noncompliant with his service plans. In short, Watson's testimony was not detailed or precise enough to support a finding, by clear and convincing evidence, that Father's interest, concern, or responsibility for the minors was not reasonable under the circumstances of this case. See *In re M.I.*, 2016 IL 120232, ¶ 30. For all of the foregoing reasons, we conclude that Watson's testimony, by itself, was not sufficient to

25

support a finding, by clear and convincing evidence, that Father was unfit on *any* of the grounds alleged in the motion. However, the inadequacy of Watson's testimony does not end our inquiry. As described above, at the outset of prove-up, the State requested, prior to calling Watson as a witness, that the circuit court "take judicial notice of the prior record of proceedings and the orders entered in 20-JA-2 and 20-JA-3, including but not limited to the more recent docket entries, indicating [Father] has failed to appear for court hearings in this matter for some months." The circuit court thereafter responded, "I didn't say it, but I'll take judicial notice of prior proceedings in this case." On appeal, the State attempts to buttress Watson's testimony with this statement by the circuit court. Indeed, in support of its arguments regarding the sufficiency of the evidence to prove the allegations in this case, the State cites to pages in the common law record containing two documents of which it seems to suggest, without stating so directly, the circuit court could have taken judicial notice: the September 10, 2020, shelter care report, and the March 30, 2021, adjudicatory order.

¶ 58    Accordingly, we turn to the issue of whether the circuit court's use of judicial notice in this case was appropriate, an issue that we review for an abuse of discretion. *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 70. It is often necessary for a circuit court, as a finder of fact, to take judicial notice of portions of the prior record during the fitness phase of termination proceedings, because doing so may help the court answer such threshold questions as what remedial steps the respondent parent was required to take, the time periods related to those requirements, and what the circuit court's prior orders were. *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 70. Nevertheless, " 'wholesale judicial notice of everything that took place prior to the unfitness hearing is unnecessary and inappropriate.' " *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 70 (quoting *In re J.G.*, 298 Ill. App. 3d 617, 629 (1998)). Although judicial notice of some portions of the record—

26

including the circuit court's prior orders—is appropriate, the evidence underlying prior orders generally may not be considered at the fitness hearing. *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 71. This is true because the decision to find a parent unfit must be based solely on properly admitted evidence, and different rules apply to the admission of evidence at different hearings. *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 71. For example, the usual rules of evidence do not apply at permanency hearings, meaning the circuit court may consider all evidence relevant to its permanency determination. *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 71. This is not the case at fitness hearings, which are governed by the rules of evidence applicable in other civil proceedings. *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 71. Accordingly, although permanency reports are admissible at permanency hearings, they constitute inadmissible hearsay under the more strict rules that are applicable at the fitness portion of termination proceedings. *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 71.

¶ 59    "Because a finding of unfitness must be based only on properly admitted evidence, it is imperative that the circuit court [must properly] limit the scope of its judicial notice to admissible evidence when making [its fitness] determination." *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 72. Because permanency reports are inadmissible at fitness hearings, they must not be judicially noticed at those hearings either. *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 72. Service plans, on the other hand, are admissible as substantive evidence under the Juvenile Court Act's version of the business records exception. *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 72 (citing 705 ILCS 405/2-18(4)(a) (West 2024)). For these reasons, consideration of service plans is appropriate, whereas taking judicial notice of permanency reports is an abuse of discretion. *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 72. Likewise,

27

"[t]he Juvenile Court Act provides that circuit courts may judicially notice testimony and other evidence from prior proceedings involving the same children if (1) the respondents were represented by counsel at those hearings or knowingly waived that right and (2) taking judicial notice will not result in consideration of hearsay at a hearing where it otherwise would be inadmissible." *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 73 (citing 705 ILCS 405/2-18(6) (West 2024)).

Moreover, a circuit court should only take judicial notice of those portions of the underlying court files that have been proffered by the State and to which the respondent has been given the opportunity to object. *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 73. We are mindful as well of the fact that "[a] circuit court errs when it 'effectively "notices" matters not introduced at the unfitness hearing.' " *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 74 (quoting *In re C.D.*, 2020 IL App (3d) 190176, ¶ 30). We are also mindful of the fact that "[i]mproper judicial notice does not always require reversal," because reviewing courts in Illinois "have repeatedly held that where the properly admitted evidence was sufficient to prove at least one ground of parental unfitness by clear and convincing evidence and the respondent parent cannot demonstrate prejudice resulting from the circuit court's error, reversal is not warranted." *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 75.

¶ 60    An overarching principle with regard to judicial notice at fitness hearings in termination of parental rights cases "is that when a party requests that the trial court take judicial notice of the prior record at a fitness hearing, the parties as well as the court must be clear as to the scope of the judicial notice requested." *In re A.L.*, 409 Ill. App. 3d 492, 504 (2011). We have held that "[t]his required clarity is important given *** the different rules of evidence that apply—namely, no formal rules of evidence [apply] at a dispositional or permanency review hearing, yet those same

28

rules of evidence are strictly enforced at fitness hearings." *In re A.L.*, 409 Ill. App. 3d at 504. We have further held that "the parties need to be explicit as to the scope of the judicial notice being requested, and the court must be explicit as to the scope of the judicial notice it is granting," because otherwise the reviewing court is left "to speculate about what evidence the trial court considered in making its determination at the fitness hearing." *In re A.L.*, 409 Ill. App. 3d at 504. Pursuant to the foregoing principles, although it would have been an abuse of discretion for the circuit court to take judicial notice of the permanency reports in this case, theoretically the circuit court could have properly considered Father's imposed service plans. *In re Soren W.*, 2026 IL App (5th) 251004, ¶ 72. Although the record on appeal prepared and forwarded to this court is replete with permanency reports, it includes no service plans. Moreover, the circuit court did not specifically state that it would take judicial notice of any service plans, and neither the circuit court's oral ruling nor its written ruling references any service plans. Accordingly, it is unclear whether, or to what extent, the circuit court relied upon service plans in making its fitness determination, or even had access to any service plans for the purpose of taking judicial notice thereof.

¶ 61    This case is further complicated by the fact that when the State asked the circuit court to "take judicial notice of the prior record of proceedings and the orders entered in 20-JA-2 and 20-JA-3, including but not limited to the more recent docket entries, indicating [Father] has failed to appear for court hearings in this matter for some months," the circuit court responded, "I didn't say it, but I'll take judicial notice of prior proceedings in this case." Thus, although asked to consider the prior record of proceedings *and the orders* entered in this case, including record sheet entries referred to by the State as "docket entries," the circuit court stated only that it would "take judicial notice of prior proceedings." It is not clear to this court what the circuit court intended to

29

encompass with that statement. Accordingly, the circuit court's statement runs afoul of the axiomatic principle, cited above, that "the court must be explicit as to the scope of the judicial notice it is granting," because otherwise the reviewing court is left "to speculate about what evidence the trial court considered in making its determination at the fitness hearing." *In re A.L.*, 409 Ill. App. 3d at 504.

¶ 62 For the reasons discussed in detail above, we conclude that the circuit court's fitness finding was against the manifest weight of the evidence. We therefore reverse the judgment of the circuit court that Father is unfit and reverse the judgment that terminated Father's parental rights.

¶ 63                                        III. CONCLUSION

¶ 64 For the foregoing reasons, we reverse the judgment of the circuit court of Moultrie County that Father is unfit and reverse the judgment that terminated Father's parental rights.

¶ 65 Reversed.

30

*In re Maybell E.*, 2026 IL App (5th) 260136

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Moultrie County, Nos. 20-JA-2, 20-JA-3; the Hon. Jeremy J. Richey, Judge, presiding. |
| **Attorneys for Appellant:** | Gage D. Barrows, of Decatur, for appellant. |
| **Attorneys for Appellee:** | Tracy Weaver, State's Attorney, of Sullivan (Patrick Delfino, Patrick D. Daly, and Luis E. Hizo Quiel, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |